The first case we have today is 20-4032 Crane v. Utah Department of Corrections. Counsel for Appellate, would you make your appearance, please? Good morning, Your Honor, and may it please the Court. My name is Samuel Weiss. I represent Janet Crane, the grandmother of Brock Tucker, a mentally ill and disabled man who committed suicide while in punitive solitary confinement at the Utah Department of Corrections. I'd like to reserve four minutes for rebuttal. I'd like to begin by discussing the District Court's dismissal of Crane's ADA claim, on the sole ground that such claims categorically do not survive the death of the injured party. This holding was legally in error, would create a circuit split if affirmed, and would have the bizarre result that disability discrimination that causes death or is against the dying would often, in practice, be rendered non-justiciable. What's the source of the circuit split that you perceive? Well, Your Honor, both the Eighth and the Ninth Circuits have created a federal common law rule of survivability around ADA claims. And don't we in Slade make recourse to federal common law? No, Your Honor, you don't. So in Slade, the sole basis for that decision was that ADA claims were, this is all implicit because there was no explicit analysis of this in Slade. But the holding in Slade was that 42 U.S.C. Section 1988 covers the ADA, or pardon me, does not cover the ADA, but covers Title VII. Yeah, and I think I got that mixed up. We've got Smith and we've got Slade. And Smith, we made recourse to federal common law. Absolutely. But why is it mutually exclusive to take into countenance federal common law, but nevertheless use a state law rule of decision? Why is that not an appropriate resolution of the matter here? Right. So absolutely. So it's an important question. And what this court laid out, has laid out in Smith and is the doctrinal question here is, would incorporating state survival law frustrate objectives of federal law? And here we argue that it would. It's in the very purposes of the ADA that the purpose of the statute is to create consistent nationwide standards to prescribe disability discrimination. How are the substantive standards of the ADA impinged upon by establishing different survivability regimes and determining when the substantive claim can be heard? That doesn't impact the uniformity of how that substantive claim is heard, does it? Well, Your Honor, often it would, as in a case like this. So there are many circumstances, this very case being one of them, but the amicus brief from a broad range of disability rights groups explains more that discrimination against the dying or that causes death would essentially be rendered non-justiciable because equitable relief would be moot and damages claims would abate if that's the case under state survival law. So that would obviously frustrate the purposes of the ADA. So we would have a circumstance where, if a public library doesn't build a wheelchair ramp and a man in a wheelchair goes up and falls, if they're severely injured, they have a textbook ADA claim, but if they die, there's no claim at all. And that would, that procedural survivalship issue would frustrate the substantive provisions of the ADA. And we cite on pages 24 and 25 of our opening brief that survivorship questions specifically are typically, typically resolved by using a universal, a federal common law rule. Um, in your, in putting on for your brief, you talk about this tension between, and I think that's your word. Yes. And Slade, well, how would you harmonize that tension? Because I mean, we're not in the business of overturning precedent. And so we're going to have to come up with some vehicle to harmonize those two. And so what's your vehicle for doing that? Absolutely. Your honor. So obviously this were a title seven case as, as Slade was, even if we thought it incorrect, it would obviously control neither Smith nor Slade controls here. So the question is what, what methodology is the most persuasive and Slade? Well, they don't implicate the same statutes, but that, I mean, their reasoning, it seems to me is causes the question as to whether they're applicable. So, I mean, yeah, dealing with the same statute, but I mean, it still seems to me to create some pull both ways. And so what's the question of how we harmonize it? I think that's right, your honor. And I think it's, it's, it's difficult to harmonize the reasoning of Slade because there is no reason. It, it simply quotes an out of circuit case from the seventh circuit, which in turn, which is a 1983 case in which 1988 clearly applies. And the only quote from Slade in Appellee's brief is the seventh circuit is Slade quoting the seventh circuit, quoting section 1988. So we laid out in our brief at some length, why we think that the methodology Slade implicitly set forth, which is that which is that the, the, we should ignore the plain text of section 1988 and extend it to all kinds of civil rights claims. Why that is incorrect. And I think it's really important to note that defendants don't really dispute any of that. So they don't take issue. They didn't go into the legislative history or the text of section 1988 with us. What they largely did was abandon what, what we refer to as their all red argument. So all red just cited section 1988 and said, yes, but putting it, putting aside 1988 for a second. And we're, I mean, this is a question of, of that irrespective of what the defendant did, we have to arrive at the right answer here. And putting aside 1988, why isn't the Supreme court's case, Kimball plews or came in and would say they have an inclination towards federal common law, adopting a state rule of decision. Why isn't that the appropriate means to resolve this map? Well, your honor. So if, if we're going to, if we're in the universe of adopting a federal common law rule, then Slade doesn't bear on the question at all because Slade did not create a federal common law rule. It looked to section 1988. So that, that precedent falls, falls away as bearing on the question. I don't think you've answered my question. Let me give you, let me give you a logic here, play out a logical argument and tell me where I'm wrong in terms of harmonizing these two. Let's take the position Smith adopts federal common law Slade without analysis leans towards applying state law, adopting a state law principle. Well, why couldn't we based upon Kimball foods and came and say, fine, well, how we resolve this is we take the state law inclination of Slade and we take the common law premise of Smith. And what that ends up with is incorporating state law as a federal common law man. Well, your honor, because I think that would be a misreading of Slade because Slade is quoting directly from section 1988. You said there wasn't any analysis in Slade. There's, there's no analysis, but we can only we can only understand it's quotation of Bennett, which is the seventh circuit case, which is a 1983 case, which is the reconstruction era statute that 1988 governs. And the quote is literally a quote of section 1988. Okay. I get the premise of 1988, but there's a whole, there are a whole lot of smart judges who chose to go down this 1988 road. I'm not saying it's the right road, but what I'm saying is what it suggests is those judges thought that the incorporation state law did not undercut the premise of, or the policy objectives of these, of these statutes that are in play here. So why doesn't that suggest that the inclination in favor of the incorporation of state law quite apart from 1988, right? Is the appropriate persuasive to use? I think your word, why isn't that the persuasive route to go then? Well, your honor, I think for a couple of different reasons. One is that these analyses took place of entirely different statutes, whereas the courts that did look at the ADA specifically in published opinions, the eighth circuit in Gunther and the ninth circuit in Wheeler held the exact opposite, which is that this would frustrate the purposes of the ADA. So, so take, for example, disability discrimination against in the use of ventilators and hospitals, which there was litigation around in COVID, which is cited in the disability rights amicus brief. Those claims would essentially be rendered non-justiciable. It would it would take the most severe cases of disability discrimination and would take it from outside the ambit of the ADA, even though its very purpose was to strengthen disability discrimination protections and make them as uniform as possible. So I think once we're in the universe of creating a uniform federal common law, which we should be, then that points towards, or pardon me, once we're in the universe of federal common law, then that points towards towards creating a uniform rule. Because of the policy objective. Right, right. Because, because even the cases that talk about, you know, the relative value and incorporating state law, they do so because they find that this would not frustrate the objectives of federal law. And here it just very clearly would. Let's, let's shift gears. Where's your clearly established law for your eighth amendment claim? And, and, and with this qualification, it seems to me that all you argued below, principally anyway, was Cox versus Glantz. And now on appeal, you have a host of other cases that you're, you're trying to trot out to establish clearly established law. So why isn't that a problem? You didn't give these cases to the district court to resolve that issue, did you? I, your honor, I'm not sure I, to be frank, I didn't do the district court briefing. That's not, that's not the answer. I know, I know, I know. But the district court obviously has an obligation to evaluate whether, um, whether plaintiff has set out allegations. And they did, based upon the law that they did, based upon the law that plaintiff provided, it's plaintiff's burden to show, to point to clearly established law. And so if you only point to Cox versus Glantz, essentially below, and now on appeal are giving us, you know, I think at least two circuit cases, maybe more, uh, uh, to establish clearly established law, isn't there a disjunction between what you argue below and what you argue on appeal? And if there is, then it seems to me, why isn't there a problem of preservation? I, your honor, I don't necessarily think so in part, because I think the real key issue here is that, um, both the district court and the defendants are treating this as if we were on summary judgment about the level of clarity needed and clearly established law. So this court held in Jensen that, uh, Peterson versus Jensen, that it is very rare that just that a motion to dismiss based on qualified immunity is appropriate. And it only is appropriate when there is no doubt. It is beyond all doubt that no set of facts could prove a clearly established violation. So I think delving deeply into what exactly we're taking your plausible averments and your complaint and why, in fact, shouldn't it be easier for you to prevail on clearly established law than summary judgment context, because we're taking your averments. We're saying, here's the factual universe, what clearly established law maps onto that. And if you don't give us established law to map onto that, then that's a problem, right? Well, yes, I think that that's true. Um, but what this court has held in the, repeatedly in this, the empirical sphere, this out as well is that the level of detail for clearly established law, um, cannot be, cannot create such a high pleading standard before discovery. And this, this case is a textbook case of this because the plaintiff is dead. Defendants constantly. Now I think the plaintiff's allegations are enough to show an egregious, uh, constitutional violation of clearly established law. However, defendants turn around and say, well, there's certain things are conclusory. Things are too vague. There's not enough to separate each individual, one individual defendant from this individual defendant. But this information is simply impossible to provide. It was defendants choice to move for qualified immunity. Well, let me, let me interrupt. I mean, I, you could make that argument for factual arguments maybe, but in terms of clearly established law, um, the obligation is to come forward with a 10th circuit or Supreme court case that clearly establishes that what you're pleading is a violation of a statutory or constitutional right. And as I understand your brief, you're, you were relying on Cox versus glands, but you were saying that we should extend it beyond the, um, the screening process when someone is admitted to jail and say that it applies more broadly to prisoners for their entire incarceration. Is that fair to what you're arguing about? I don't think so your honor, because I actually, I actually think it cuts the other way. I think, uh, the cases Cox and, and Taylor versus barks that are about screening protocols are not nearly as strong as the facts here for, for two different reasons. One is that the screening protocols are about when somebody is just coming into prison here, the plaintiff was in prison for two years. So the defendants cannot say that they didn't have knowledge, or at least it's certainly plausible that the defendants had knowledge of his serious mental health problems. Do you have to plead that? Do you have to say, um, you know, yes. And yes, and we did, well, you say, um, new or should have known or knew, um, through it. And there's no facts about, you say, um, a doctor diagnosed him and put him on medication, but there's no allegation that the doctor ever communicated with the defendants here about the, uh, mental illness of the, the prisoner. And so I'm wondering, did you miss some, were you required to plead that? I, your honor, I think, I think we were required to plead that. And I think we did. So, um, to go, to go through the defendants and I see I'm out of time, but just very briefly, um, uh, record page 43 is defendant Taylor knew that solitary confinement would cause, uh, a risk of suicide on page 39 of the record. It states that all defendants knew that solitary confinement would create a risk of suicide. Um, and there is a wealth of information in the record buttressed by the amicus brief by people who ran departments of corrections that they, that it is widely understood that people with serious mental health issues are, um, had the risk of suicidality, which here was obviously very extreme, uh, by, by solitary confinement. Um, in the case of defendant officer Cox also on, uh, page 45 of the record that he did know the mental health history of, uh, of Mr. Tucker and that he was put on notice of, uh, the towel covering his cell, which, which gave him the opportunity to commit suicide. He had to not ask. So, so I think that, that, um, that sort of allegation is required in the pleadings. And I think it's there, especially on rule 12, when all inferences need to be made in light of the poison. The Jones, I know he's out of time, but do you know, please, please, please. So I just want to follow up on what you just said, Mr. Weiss. So you've identified four places in the complaint. And I, and I will tell you, I agree with you that you have said that each of these four defendants knew, uh, of his serious mental health condition. The question that I'm going to ask you is how do you distinguish Iqbal? Because precisely the same allegation took place in Iqbal and the Supreme court took pains to say, we are not saying that these are fanciful allegations. We are saying under rule 12, that the allegation that the attorney general of the FBI director knew is conclusory. And so if you acknowledge that you have to do more than allege and make a conclusory allegation of knowledge, how do, how, how do we say that this is not conclusory? And yet the Supreme court said almost identical allegations of knowledge were conclusory in Iqbal. Thank you, your honor. I think we do need to go above and beyond, but here we're not talking about the director FBI or the attorney general of the United States. We're talking about the head of clinical services and the warden of a prison where the plaintiff had been incarcerated for two years. And we're not talking about somebody who was just simply depressed, but somebody who was psychotic, whose IQ rendered him mentally disabled and had a variety of other diagnoses. Uh, he was constantly in and out of solitary confinement. Um, all of those disciplinary processes by prison policy, we're supposed to include review by a mental health professional, obviously in the final case, they were, they were not done here, uh, which is part of the allegation against defendant Taylor, but it's, it's, it is obviously more plausible here that a warden of a prison that a director of clinical services at a prison would understand that one of their most problematic, one of their sickest inmates, somebody who any of us in a, in a momentary conversation would understand has serious mental problems, um, was, uh, was a risk, um, when he had been incarcerated in this facility for two years. Uh, thank you. And thank you judge Holmes for it. Your time is not your own, and I don't want to suggest that it is, but, uh, uh, but, uh, so we have taken it. And so I'm going to give you one minute of rebuttal time at the conclusion of, defendants presentation. Thank you very much, your honor. Um, good morning, your honors. May it please the court. I'm Joshua Davidson, assistant Utah solicitor general on behalf of the Utah department of corrections, Alfred Bigelow, Richard garden, non-Taylor officer Cox, Susan Burke, and Brent. The district court correctly granted judgment on the pleadings based on qualified immunity on crane's eighth amendment claims. And this court should affirm for two reasons. First crane has failed to satisfy the clearly established prong of the qualified immunity standard. She points to no us Supreme court case or any 10th circuit precedent that would have put the individual defendants on notice and would have placed the constitutional question beyond debate. She relies primarily on district court cases from outside of this circuit and the other circuit court cases that she does site Sanville Jacobs, snow and Coleman do not stand for the proposition asserted. And the cases are so factually dissimilar from this case that they cannot be construed to establish a clearly asserted constitutional right. In Cox versus glands, when the majority opinion says since at least the mid 1990s, the court has recognized that prison officials are allowed to incur liability for deliberate indifference. If they have quote knowledge that a specific inmate presents a substantial risk of in this disregards it and combined with Mr Weiss's allegations that he just referred to where he specifically identified in the complaint that each of the defendants knew that that that that he had a that he was at a substantial risk of suicide. Thank you, Your Honor. First of all, the allegations of the complaint to conclusory as you pointed out. Second, the allegations are not that they knew that he was suicidal. The allegations of the complaint are that he was diagnosed with a mental illness. He was treated by Dr Garden. He was prescribed medications. He improved and there's no allegation that any of the individual defendants had subjective knowledge that he was substantial suicide risk. This is very different than the other cases that he cites the Coleman's knowing and Jacobs Sandville. In each of those cases, the inmate or the detainee had been placed on suicide watch, or the individual officer had subjective knowledge that they were an imminent risk of suicide. They either wrote a suicide note, their parents called them and told them that they were suicidal. They had interviewed people where they had, you know, either another prisoner, or in investigating, they learned that they were suicidal. They demonstrated abnormal behavior, climbing on sinks and banging their head against the wall. You know, there's no such allegations here. Here, there's let's let me ask you to apply that. And I'm not trying to test you. But one of the where he says, quote, defendant Cox knew and should have known that Brock had a long history of severe mental health conditions, including brain damage, unspecified psychosis, major depressive disorder, that he was under treatment for these conditions, and that prolonged periods of isolation, tortured Brock, and would cause or exacerbate severe mental illness, mental anguish, helplessness, depression, anxiety, and insanity, and suicidal tendencies. And there were similar allegations that I think referred specifically to suicidal tendencies for Taylor, Bigelow and Barden. So how do we so how do I apply your argument to the terms of what he's alleged? Well, the allegation is the newer should have knowns which is there's no underlying factual allegations to support the conclusory allegation. There's no allegation that explains how they knew this, or why they should have known this. And the allegation is they should have known that being in solitary confinement would increase suicidal risk. But this that's different than being known that someone is an imminent and substantial risk of suicide. You know, here, there's no allegation that on October 2, 2014, that, you know, that Tucker exhibited suicidal behavior, there was no allegation that, you know, that they knew that he was suicidal, he didn't express suicidal ideation, you know, he wasn't diagnosed being having suicidal ideation. So it can't be communicated that he had suicidal ideation. And it is not an Eighth Amendment violation to, you know, misdiagnosed, nor is it a violation to, you know, not recognize something that you should have, like under the standard, they have to both, you know, recognize facts that they could draw the inference, and then they have to draw the conclusion that there are no allegations in the complaint, which would plausibly allege that any of the individual defendants knew that he was a substantial risk of suicide, but let me and I'm sorry to take up so much of your time. But let me just ask one specific question with Taylor, in particular, because of the nature of the policy that he was required as a hearing officer to determine whether the mental illness caused the bad behavior that precipitated the disciplinary issue in the first place. Is it fair to say that, at a minimum, the First Amendment complaint adequately alleged, because of the nature of that policy requirement, that at least Taylor would be charged with knowledge of whatever was in his, in his medical file with regard to mental illness? Well, there is no allegation that he was, you know, read the medical file. But more importantly, you know, this, the violation of an internal prison policy doesn't is not constitute a constitutional violation. And in Graham v. Van der Ver, this court concluded that an inmate's allegation that he was given a 45 days of punitive isolation, without first obtaining medical consultation to determine whether his punishment would aggravate his mental condition was insufficient to state an Eighth Amendment claim for deliberate indifference. With respect to the individual defendants, Warden Bigelow and Dr. Garden, with respect to Warden Bigelow, he didn't return to be warden until April of 2014. That's clear to complain. But this, the allegations against him are conclusory. And in this court, in Vega v. Davis, said that the conclusory allegations that a warden knew or was willfully ignorant of an inmate's serious medical needs was insufficient, it was conclusory, and that the warden's general responsibilities, i.e. that he visited the prison or that he had access to medical records, were insufficient to plausibly suggest that the warden had enough knowledge to be deliberately indifferent. Similarly, with Dr. Garden, Dr. Burnham examined and treated him, prescribed a coercive method. There's no constitutional violation alleged against Dr. Burnham, so we cannot have supervised reliability against Dr. Garden. And with respect to Oprah Cox, again, there was no allegation that he was aware on that day that he presented substantial risk. During the period that he was at this facility, which I think was two years, did he ever try to kill himself during that period? I know he tried to kill himself one time prior. There's no allegation to complain that he attempted suicide while in custody of CUCF. The allegation that was in 2009, while he was in a juvenile facility, he attempted to commit suicide. But he was released from that facility. He was later convicted of theft and incarcerated in the Utah Department of Corrections system, but there's no allegation that he attempted suicide or engaged in self-harm prior to October 2nd, 2014. Let's let's fast forward to the ADA Rehabilitation Act claims and their deal at the threshold with this issue relating to survivability. Specifically, I'd ask you, do you perceive a tension between our Smith and as they apply to these facts? Well, as we set forth on pages 54 to 57 of our brief, I believe that any perceived tension can be reconciled and that the court cases can be harmonized by, you know, by having federal common law incorporate, you know, adopt state laws, rules of decision. And the Nordwall case that we cited kind of went through that and harmonized that. And we think that... Yeah, but Nordwall in footnote 23, in fact, I think they suggested that we were wrong. The district court said that we were wrong in what we did, I think, in Slade in terms of how we relied upon 1988, didn't it? So, I mean, Nordwall has a lot of analysis, but it doesn't necessarily... It said it's following the rule because it thinks it has to follow the rule, but it thinks that we were wrong. Well, you know, even if you think that, you know, that the reading of 1988A should not include, you know, specific civil rights statutes that weren't in 1988A, I think that, you know, you can adopt like the Kimball case, you know, the inclination is to adopt state common law as part of federal common law. Well, let me interrupt you there. You're relying on a Utah federal district court as stating the rule for survivability that you suggest we should use, correct? I think that this court's precedent supports applying state law to survivability, and I believe that the Utah survivability statute precludes this claim going forward. Well, hasn't the Utah Supreme Court expressly rejected your argument in Gressman v. State that came out after the Allred decision? I know neither of you includes torts like malicious prosecution that infringe on a person's rights because they seek to redress harm done to the person, which seems to go directly contrary to the argument that Allred followed that it's only an injury to their rights and not an injury to the person. So, I would suggest that even if we were to adopt the Utah survivability rule, this would survive. Well, this is a 2014 case, and it's based on the statute that was in effect at that time. But, you know, this court can avoid any perceived, you know, circuit split. It can avoid even, you know, addressing the survivability statute because the Crane's complaint fails to allege a plausible ADA or Rehabilitation Act claim. There's no allegation that UDOC excluded Tucker from participation in or denied the benefits of prison services, programs, or activities by reason of an alleged disability. What about safe housing? I'm sorry, what? What about the right as a disabled individual to be housed in a cell that is safe? Well, again, Crane is conflating mental illness with suicide delidiation. You know, there's a big difference between being diagnosed with mental illness and being, you know, diagnosed as a substantial suicide risk. And not every mentally ill patient is suicidal. Not every person that commits suicide has a mental illness. And if the alleged disability is that he's suicidal, then he didn't communicate that disability to anybody at the UDOC, nor was it obvious that he had that. So, I don't think that the ADA claim can hinge on suicidal thoughts. And then, so he doesn't allege enough facts. What he does allege is, you know, that Crane participated in self-help programs. You know, he was doing well. He had access to educational and self-help materials. He had access to medication and treatment. And he's essentially arguing that he had, you know, we had a reasonable accommodation to prevent him from committing suicide. But of course, the failure to diagnose him as having a suicidal ideation is not an ADA claim or Rehabilitation Act claim. You know, the failure to provide medical care to a disabled person is not an ADA claim. And the idea that, you know, the accommodation that he wants is to be in a cell with no bed and no bedding. Like, you know, if the UDOC put every mentally ill patient in a cell that had no bed and no bedding and no tie-off point, I'm sure we'd be sued for an ADA violation. Well, I think the argument's a little different. The argument is the combination of the mental illness with excessive periods of punitive isolation are what caused the problem and violate the ADA here. And so, you wouldn't do it to every mentally ill patient in the corrections department. But if you're going to impose these kind of sanctions on someone who's already vulnerable due to a mental illness, then they're arguing that you've got to be hypervigilant because their argument is that we know it creates a risk of exacerbation of their condition. I see that my time's up, but if I may, if I may answer. The ADA violation requires intentional discrimination or, you know, which can be evidenced by deliberate insurance. And the allegations of the complaint do not show that anybody was aware of a substantial risk of suicide by Crane. He didn't demonstrate, he never communicated that he was suicidal. He never exhibited any suicidal things. He didn't try to commit suicide previously in solitary confinement. So, I don't think that there's enough to allege that the intentional discrimination that he was discriminated on the basis of his any alleged disability. He doesn't allege that any non-mentally ill people were treated better or subjected to punitive isolation. He doesn't allege he wasn't capable of understanding prison rules or the charges against him or that he didn't participate in the disciplinary hearings. He doesn't allege that any non-mentally ill patient who wasn't punitive isolation had greater access to services. So, there's just not enough allegations in the complaints of plausible stated claim. And I would humbly request that this court affirm the district court judgment in its entirety. Thank you, Mr. Jacobson. One minute for Mr. Wise, if he wants. Thank you very much, your honor. First, I would just say, you know, I was asked a question about this idea of harmonization by following Nordwell is beyond forfeited. Their initial motion for judgment on the pleadings didn't mention survivability at all. And then in their reply brief, they cited disregard everything we said. They basically said disregard everything else we said. We found this case all read. This decides it. And that's exactly what the district court adopted. So, and all read again is the 1988 argument. It is not about they never argued that they should, that the district court should create a federal common law rule that incorporates state law rule. There's no way to possibly read that in. Even the survivability issue at all should be waived because it was raised in a reply brief where they said we just discovered this case that was from 1997. And second, I would just say as to an obviousness point, again, we're talking about somebody with a 70 IQ, mentally disabled, too mentally ill to be, or too mentally disabled to be executed even, who is diagnosed as being psychotic, who is diagnosed with major depressive disorder, which unlike suicidal ideation is a mental illness that can be diagnosed. And we have an amicus brief from several people who ran statewide department of corrections that said in 2014, people who ran correction systems and who worked in correction systems knew that people with mental illness, with serious mental illness should not be put in solitary confinement, period, full stop. And so the argument that it's not plausible, that it was obvious to defendants that he needed an accommodation. And again, not just any kind of solitary confinement, but a very It's not necessary. Just a reminder, you're exceeding the allotted additional minute. Thank you very much, Your Honor. I appreciate your time. The case is submitted. Thank you, counsel.